**KAYFIRST CORPORATION, Plaintiff,**

**v.**

**WASHINGTON TERMINAL COMPANY, et al., Defendants.**

**Civ. A. No. 91–404 (GHR).**

United States District Court, District of Columbia.

Feb. 8, 1993.

---

Charles R. Donnenfeld, Schwalb, Donnenfeld, Bray & Silbert, Washington, DC, for KayFirst Corp.

William A. Caldwell, Asst. Gen. Counsel, Washington Metropolitan Area Transit Authority, Washington, DC, for WMATA.

Richard A. Kramer, Kramer & Gorney, Oxon Hill, MD, for Chicago Title Ins. Co.

James R. Myers, George F. Pappas, Vicki Margolis, Venable, Baetjer, Howard & Civiletti, Washington, DC, for third-party defendants CSX Transp., Inc., and Mt. Clare Properties, Inc.

## MEMORANDUM OPINION AND ORDER

REVERCOMB, District Judge.

This is an action for trespass, originally filed in the Superior Court for the District of Columbia and removed to this Court by defendant Washington Metropolitan Area Transit Authority ("WMATA"). Jurisdiction rests on the WMATA Compact, D.C.Code § 1–2440 (codifying Act of Nov. 6, 1966, Pub.L. No. 89–774, § 4, 80 Stat. 1324, 1353).

The Court has before it the first of two rounds of summary judgment motions.[1] The motions in this first round are: 1) the Motion for Partial Summary Judgment of plaintiff KayFirst Corporation, Inc. ("KayFirst"), addressed to WMATA's liability for trespass as claimed in Count I of KayFirst's Second Amended Complaint; 2) WMATA's Motion for Summary Judgment against KayFirst, seeking dismissal of KayFirst's trespass claim against WMATA; and 3) the Motion for Summary Judgment of defendant Chicago Title Insurance Com-

---

1. WMATA has filed a third-party complaint in this case against CSX Transportation, Inc., the Real Estate and Improvement Company of Baltimore City, and Mt. Clare Properties, Inc. (collectively "the third-party defendants"). The anticipated second round of summary judgment motions will concern WMATA's claims against the third-party defendants.

pany ("Chicago Title") on KayFirst's breach of contract claim against Chicago Title contained in Count III of the Second Amended Complaint.[2] The only questions before the Court at this time, therefore, are those concerning the liability of WMATA and Chicago Title, respectively, to Kay-First. The potential liability of other parties, and the determination of damages (if any), await another day.

The Court has carefully reviewed the motions papers and supporting exhibits filed by these three parties, and has heard from their counsel at oral argument. Additionally, the Court has examined an abstract of title on the properties in question, which WMATA compiled at the Court's request, as well as a response to that abstract from Chicago Title. On the basis of this review, the Court finds as follows.

## I. *Background*

Resolution of the present round of motions turns on whether a subterranean foundation step footing to a retaining wall, constructed between 1905 and 1907, constitutes a trespass and a substantial encroachment on KayFirst's land. The invaded property is a triangular parcel of land north of Union Station in the District of Columbia, acquired by KayFirst in 1988 and to which it holds title. This piece of land is described in its deed as Parcel 4. Parcel 4 is adjacent to another parcel of land owned by defendant WMATA, which it acquired in 1973 during construction of the Metro Rail Red Line (the Red Line tracks pass over this second parcel today). The parcel of property to which WMATA now holds title is described in its deed as Parcel 14.

On the boundary between Parcels 4 and 14, although standing on the WMATA-owned property, is a retaining wall which helps support the elevated Red Line tracks. On a horizontal plane, beginning 4 feet below the surface of the ground and extending to a depth of 13 feet, is a step footing to this retaining wall that extends some 7 feet into KayFirst's property. The retaining wall was built at some time between August 1903 and October 1907 along the eastern border of what became Parcel 14 at the direction of the Baltimore and Ohio Railroad Company ("B & O") for the Washington Terminal Company ("WTC") during the construction of Union Station and its elevated rail yard. *See* Rumpf Aff. ¶ 6; WMATA's Mem. in Supp. of Mot. for Summ.J. at 4.

Through a complicated series of deed transfers in the early 1900s, the real estate that came to comprise Parcels 4 and 14 was assembled by the Real Estate and Improvement Company of Baltimore City ("RE & I"), at the time a wholly-owned subsidiary of the B & O,[3] and WTC, with the boundary between the two parcels dividing along the face of the retaining wall. As a consequence of these conveyances, WTC came to hold title to property containing Parcel 14 by five deeds, each from a different grantor, dated and recorded between May, 1903, and January, 1905. WTC continued to hold title to this property until 1973, when it conveyed Parcel 14 to WMATA in fee simple by special warranty deed dated May 7, 1973, and recorded June 5, 1975. WMATA was at the time engaged in acquiring property on which to construct the Red Line for the Metro Rail system. There is no dispute at this juncture that WMATA presently holds title to Parcel 14.

As for Parcel 4, part of this property was conveyed to RE & I by three deeds, dated, respectively, May 15, 1902, October 10,

2. Count II of the Second Amended Complaint, consisting of a claim by KayFirst against the surveyors A. Morton Thomas and Associates, Inc., was dismissed without prejudice on April 22, 1992, pursuant to a stipulation between those parties.

KayFirst's claims against the Washington Terminal Corporation ("WTC") and the National Railroad Passenger Corporation ("Amtrak") were similarly dismissed without prejudice by stipulation on August 31, 1992.

3. *See* Aftoora Dep. at 11. As a consequence of mergers of its parent corporations, RE & I is now a wholly-owned subsidiary of CSX Transportation, Inc. ("CSXT"). *See id.* at 10. WMATA characterizes the function of RE & I as that of "a shell corporation holding legal title of real estate" for its parent railroad corporations. WMATA's Mem. in Supp. of Mot. for Summ. J. at 5.

1902, and May 15, 1902, from one George E. Fleming, *et ux.*, all of which were recorded in November, 1902. The balance of what became Parcel 4 was conveyed to RE & I from WTC by deed dated February 1, 1904, and recorded January 11, 1905. Kay-First acquired title to Parcel 4 from RE & I and Mt. Clare Properties, Inc. ("Mt. Clare") by deed dated October 26, 1988, and recorded the next day.[4] KayFirst contends—and it is undisputed—that it purchased Parcel 4 for commercial development purposes, including the construction of office and retail space and underground parking facilities, and that the footing precludes the construction of this project as planned. *See* Pl.'s Mem. in Supp. of Mot. for Summ.J. at 2.

## II. *Analysis*

### A. The KayFirst and WMATA Motions

The Court discerns no material facts in dispute among the parties. Rather, the disputes are ones of law or have to do with the legal consequences to be derived from undisputed facts, thereby making summary judgment appropriate. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1976) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment").

KayFirst maintains that, at the time it acquired Parcel 4, it was unaware of the existence of the footing, which was only revealed during the course of test excavations on the site in January 1989. *See* Pl.'s Mem. in Supp. of Mot. for Summ.J. at 2. Prior to that time, KayFirst claims it had no actual or constructive notice of the footing and that no facts and circumstances existed which would give rise to a duty to inquire. *See Clay Properties, Inc. v. Washington Post Co.,* 604 A.2d 890, 897 (D.C.1992). KayFirst further claims that the encroachment precludes the construction project it had planned for the site. It concludes that the encroachment is a trespass, which D.C. law recognizes as " 'an

invasion of the interest in the exclusive possession of land,' " *Carrigan v. Purkhiser,* 466 A.2d 1243, 1243 (D.C.1983) (quoting Restatement (Second) of Torts § 821D, comment d); W. Page Keeton *et al., Prosser and Keeton on the Law of Torts* § 13, at 77, 82–83 (5th ed. 1984), for which WMATA, as the owner of the adjacent property containing the retaining wall to which the step footing is attached, is liable.

As KayFirst recognizes, the encroachment is not actionable as a trespass if WMATA possesses an enforceable easement right to maintain the step footing on the KayFirst property. This argument forms the basis of WMATA's summary judgment motion. WMATA argues, with reference to the step footing, that it has easement rights over Parcel 4 on three, alternative theories: 1) that its deed to Parcel 14, recorded in 1975, included "easements and appurtenances" language in the deed habendum which constituted an express grant of an appurtenant easement in Parcel 4 for the Parcel 14 retaining wall, of which KayFirst had record notice; 2) that an easement by necessity was created for the step footing either at the time the retaining wall was built or at the time Parcel 14 was conveyed to WMATA in 1973; or 3) that an easement by prescription arose by adverse possession in WTC as against RE & I fifteen years after the construction of the step footing in 1907. Additionally, WMATA argues that Kay-First's action is time-barred under the case of *L'Enfant Plaza East, Inc. v. McShain,* 359 A.2d 5 (D.C.1976).

The Court finds none of WMATA's arguments persuasive. The theory that the 1973 deed contained an easement by express grant in favor of Parcel 14 must be rejected in light of the legal standards to be followed under District of Columbia law. "There are no particular words of art necessary to create an easement by express grant." *Katkish v. Pearce,* 490 A.2d 626, 628 (D.C.1985). Rather, the Court must consider the "language and circum-

---

4. At the time of this last conveyance, Mt. Clare was a second-tier subsidiary of CSX Realty, Inc., which was itself a wholly-owned subsidiary of CSX Corporation. *See* Kyle Dep. at 10–11.

stances" of the deed in light of such factors as the specificity of the intent of the deed to create an easement in favor of Parcel 14, the detail with which the boundaries of the easement are spelled out and the ease by which they can be found, and the actions of the parties. *Id.* Having reviewed the deed in light of these factors, the Court finds no evidence of intent on the part of RE & I and WTC to create the easement in question and no detailed description of any easement in favor of Parcel 14 over Parcel 4. The words "improvements, easements, and appurtenances thereunto" appearing in the deed habendum—whether considered on its own or in conjunction with a reference to a purchase agreement of November 30, 1971, appearing in a "whereas" clause preceding the deed habendum or the description of Parcel 14 in a schedule attached to the deed—are simply insufficient to create an easement by express grant as WMATA maintains. *See* Newman Aff., Ex. 3 (deed of May 7, 1973).

 Moreover, the Court discerns no basis for holding KayFirst to notice of the step footing. WMATA argues that Kay-First must be held to record notice of the deeds in Parcel 14's chain of title because, by two trust agreements in 1906 and a third in 1942, the beneficial ownership of Parcel 4 was conveyed to WTC and others. *See* WMATA's Mem. in Supp. of Mot. for Summ.J. at 20. Pursuant to these trust agreements, WMATA argues, RE & I held no more than bare legal title to Parcel 4, while WMATA's grantor WTC held "full dominion and control" of that piece of property as well as full title to Parcel 14. *Id.* at 22. It is undisputed, however, that none of these trust agreements were recorded, *see* Newman Aff. ¶¶ 6–7, and that, therefore, they are not effective against KayFirst if KayFirst is a subsequent bona fide purchaser without notice of outstanding claims of third parties. *See* D.C.Code § 45–801. KayFirst can be held to inquiry notice "of all facts and outstanding interests which a reasonable inquiry would have revealed." *Clay Properties,* 604 A.2d at 895. There is no dispute that the step footing is not visible on the site and that it was not

disclosed to KayFirst prior to settlement despite its efforts to ascertain the state of the title and the condition of the property. These efforts included a survey, obtaining affidavits from its grantors in addition to a title report, and undertaking an environmental engineering study to determine the extent of possible contamination on the site. The Court does not believe that WMATA's evidence, including the two Rumpf affidavits, raises triable issues of material fact that a purchaser of ordinary prudence would have inquired further. It follows, therefore, that KayFirst may be deemed to have been a bona fide purchaser of Parcel 4 without notice of the step footing, *see id.* at 894–95, and that whatever interests may have been created by the unrecorded trust agreements are of no effect as to KayFirst.

 WMATA's contention that the step footing constitutes an implied easement by necessity over Parcel 4 must also be rejected. An implied easement can arise only after the owner of an estate, having created a quasi-easement over one part of the estate reasonably necessary for the benefit of another part, severs the burdened and benefited parts of the estate by conveying each part to different grantees. *See Robinson v. Hillman,* 36 App.D.C. 241, 247 (1911). Unity of ownership is thus a prerequisite to a finding of an implied easement. In this case, however, the abstract of title shows that, during the years 1903 to 1907, when the retaining wall and step footing were constructed, there was no unity ownership between Parcels 4 and 14. District of Columbia courts have held, moreover, that the original quasi-easement must be apparent and that a concealed easement can pass only by express grant. *See Sullivan v. Neam,* 183 A.2d 834, 835 (D.C.1962); *Robinson,* 36 App.D.C. at 247 (emphasizing that the quasi-easement must be "of an *apparent* and continuous character"). It is undisputed that, while the retaining wall on Parcel 14 is apparent and visible, the step footing is neither, having been covered up no later than 1907. As a matter of law, therefore, no implied easement by necessity can have arisen.

There can be no easement by prescription for a similar reason. Under District of Columbia law, an easement by prescription will arise only if the claimant's use of the servient estate is, among other things, open and notorious; a concealed use, by definition, cannot be open and notorious. *See Sullivan,* 183 A.2d at 835; *Schwartz v. Atlantic Bldg. Co.,* 41 App. D.C. 108, 111 (1913). The use must be open and notorious, moreover, for the duration of the statutory period, which in the District of Columbia is fifteen years. *See Chaconas v. Meyers,* 465 A.2d 379, 382 (D.C.1983); *see also Smith v. Tippett,* 569 A.2d 1186, 1190 (D.C.1990) ("To establish title by adverse possession, a claimant must demonstrate actual, open and notorious, exclusive, continuous, and hostile possession of the premises for the prescribed statutory period under a claim of right or title"). Here, it is undisputed that the step footing was visible only during the period of its construction, which began at the earliest in 1903 and concluded at the latest in October 1907.

WMATA argues, however, that, because the retaining wall and its step footing were built under the supervision of the B & O and because KayFirst's predecessor in interest, RE & I, was a B & O subsidiary, a presumption attaches that RE & I knew of the presence of the step footing on Parcel 4 even after it had been covered over, so that the easement ripened by prescription in 1922. WMATA's argument ignores the element of adversity necessary to establish a prescriptive easement. *See Chaconas,* 465 A.2d at 382. In the absence of open and notorious use for the duration of the statutory period, adversity must be established by evidence that the use was under a claim of right. *See id.; Aleotti v. Whitaker Bros. Business Mach., Inc.,* 427 A.2d 919, 921–22 (D.C.1981). Not

only has WMATA not come forward with any evidence that the use was maintained under a claim of right, its own evidence strongly suggests the opposite conclusion: that the B & O, through its real estate shell RE & I, consented to the presence of the step footing on Parcel 4. As a matter of law, a permissive use cannot give rise to a prescriptive easement. *See Chaconas,* 465 A.2d at 381–83.

If no easement rights over Parcel 4 exist in favor of Parcel 14, then it follows that KayFirst's trespass claim is actionable if it is timely. WMATA argues that, because the step footing is a permanent structural encroachment under the three-part test applied in *L'Enfant Plaza,* any action for trespass as to this encroachment accrued no later than October 1907, and subsequently became time-barred, under the applicable three-year statute of limitations, *see* D.C.Code § 12–301(3), after 1910.[5] KayFirst, for its part, urges that this case is factually similar to *L'Enfant Plaza* and thus compels the same conclusion as reached therein by the District of Columbia Court of Appeals, that the encroachment is a continuing trespass.

WMATA has come forward with evidence attesting to the necessity of the step footing to support the retaining wall, *see* Rumpf Aff. ¶¶ 9–19, from which it concludes that the step footing qualifies as a permanent encroachment under the *L'Enfant Plaza* analysis. Yet in the Court's view, WMATA reads *L'Enfant Plaza* too narrowly. A careful reading of that opinion indicates that the D.C. Court of Appeals considered not merely whether the encroachment in that case was permanent, but also that it was concealed. *See L'Enfant Plaza,* 359 A.2d at 7 (quoting *509 Sixth Ave. Corp. v. New York City,* 15 N.Y.2d 48, 255 N.Y.S.2d 89, 92, 203 N.E.2d

---

5. In determining whether an encroachment is a permanent (as opposed to a continuing) trespass, the D.C. Court of Appeals quoted three factors articulated by Dobbs:
 (1) is the source of the invasion physically permanent, i.e., is it likely, in the nature of things, to remain indefinitely?
 (2) is the source of the invasion the kind of thing an equity court would refuse to abate by

injunction because of its value to the community or because of relations between the parties?
 (3) which party seeks the permanent or prospective measure of damages?
 *L'Enfant Plaza,* 359 A.2d at 6 (quoting D. Dobbs, *Remedies* § 5.4, at 338 (1973)).

486, 488 (1964), that "although the nature of the structure may be permanent, the nature of the trespass is continuous"). Although KayFirst has presented evidence, in a form acceptable under Fed.R.Civ.P. 56(e), that the encroachment of which it complains was not visible before it was uncovered in the course of excavation work in early 1989, *see* Pl.'s Ex. H, at 3–4 (Answer to Interrog. 3), it has failed to come forward with any affidavits or other Rule 56(e) materials in opposition to the factual predicates underlying WMATA's motion for summary judgment on the statute of limitations issue.[6]

██ KayFirst's failure to comply with Rule 56(e) does not mean, however, that WMATA wins. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (stating that the party seeking summary judgment bears an initial burden of informing the court as to the basis for its motion). Although the distinction between a permanent and continuing invasion is usually crucial in determining when a cause of action accrues for trespass or nuisance, *see Beatty v. Washington Metro. Area Transit Auth.,* 860 F.2d 1117, 1122 (D.C.Cir.1988), in this case the result is the same. If the encroachment is a continuing trespass, then "[t]he cause of action accrued on the date of the trespass and continued until three years after the encroachment [is] re-

moved." *L'Enfant Plaza,* 359 A.2d at 7. "If the invasion is deemed to be 'permanent,' there is but one cause of action, and the statute of limitations commences to run from the time the invasion began, *or when it became known to the aggrieved party,*" which in this case is KayFirst. *Beatty,* 860 F.2d at 1122 (citing Dobbs, *Remedies* § 5.4, at 343) (emphasis added). KayFirst acquired title to Parcel 4 in October 1988, discovered the step footing in January 1989, and filed its first amended complaint in this case in January 1991, well within the three-year limitations period if the encroachment be considered permanent. WMATA's Motion for Summary Judgment must be denied, therefore, on the statute of limitations issue.

### B. Chicago Title's Motion

██ Finally, there remains to be considered Chicago Title's Motion for Summary Judgment. Chicago Title agrees with KayFirst that the step footing constitutes a trespass on Parcel 4 which may be actionable against WMATA, but argues that KayFirst's breach of contract claim against the insurer must be dismissed because the trespass does not adversely affect KayFirst's title and is therefore outside the scope of the policy. This is the only issue before the Court on Chicago Title's Motion.[7]

---

6. KayFirst's arguments in its memorandum in opposition to WMATA's Motion for Summary Judgment are unsupported by any Rule 56(e) materials and its own Motion for Summary Judgment does not address the statute of limitations issue raised by WMATA. Accordingly, and notwithstanding the arguments it makes in its opposition memorandum at 11–14, KayFirst has failed as a matter of law to meet its burden as the non-moving party in resisting summary judgment as to the timeliness of its lawsuit. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) ("Rule 56(e) ... requires the nonmoving party to go beyond the pleadings and by [its] own affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "). For instance, KayFirst has not come forward with an affidavit or deposition challenging the conclusions of WMATA's engineering expert as to the necessity of the step footing to the retaining wall or in support of its assertion that "[r]emoving the Footing and replacing

it with alternative means of support can be readily accomplished and would have no greater effect on the stability of the retaining wall than the removal of the foundation in *L'Enfant* had on the HUD building." · Pl.'s Mem. in Opp'n at 12.

7. In its Opposition to Chicago Title's Motion, KayFirst raises for the first time the issue whether Chicago Title's alleged failure to defend KayFirst in this lawsuit constitutes a breach of its contractual obligations independent of any duty to indemnify KayFirst for loss resulting from the trespass. Chicago Title, for its part, did not address this issue in its Motion for Summary Judgment and did not file a Reply brief to KayFirst's Opposition.

The Court notes that the title insurance policy, a copy of which is attached as Exhibit A to KayFirst's Opposition, clearly encompasses a duty to defend the insured in certain circumstances, and that KayFirst notified Chicago Title, by letter dated June 18, 1991, that WMATA

Whether an unrecorded, subterranean encroachment determined to be a trespass is covered by an insured's title insurance policy is a question that has not been addressed by courts in this jurisdiction in any recorded decision of which this Court is aware. Neither the parties nor the Court, moreover, have discovered any decision by courts in the District of Columbia or Maryland, from which the District derives its common law, based on similar facts. Chicago Title, for its part, cites a decision of the Supreme Court of Texas for the proposition that an insured's "good and indefeasible" title is not undermined as a result of a trespass. *Southwest Title Ins. Co. v. Woods*, 449 S.W.2d 773, 774 (Tex.1970). This Court does not read *Southwest Title* so broadly. In that case, the landowner, after taking title to a tract, discovered a timber company cutting timber on the tract pursuant to a claim of right under a void deed outside the chain of title. *See id.* at 773–74. While the Texas court did not charge the landowner with constructive notice of an instrument outside his chain of title or with knowledge of prior timber-cutting on the tract, and found the timber company to be a trespasser, the court's conclusion that the landowner lacked a claim against his title insurer was reached only after reviewing the language of the policy "under the circumstances of this case." *Id.* at 774–75. The court did not hold that, as a matter of law, a trespassory invasion could neither affect title nor give rise to a claim under a policy of title insurance.

Thus, the mere application of the label "trespass" to the step footing does not resolve the instant motion in Chicago Title's favor. That label may connote

the legal attributes of an invasion, but it tells us little about the character of the invasion itself. *Cf. Prosser & Keeton* § 13, at 72–73, 78–83 (listing some of the different kinds of invasions that may be actionable as trespasses). Rather, whether a particular loss is within the coverage of title insurance depends in the first instance on the stated conditions of the individual policy. *See Eureka Inv. Corp., N.V. v. Chicago Title Ins. Co.*, 530 F.Supp. 1110, 1118 (D.D.C.1982), *modified on other grounds*, 743 F.2d 932 (D.C.Cir.1984). "Since … a title insurance policy is a contract, it follows that 'in the absence of constitutional or statutory barriers, the parties are at liberty to make their own agreement' [and] are generally free to define what losses or encumbrances they intend to be covered." *District–Realty Title Ins. Corp. v. Jack Spicer Real Estate, Inc.*, 280 Md. 422, 373 A.2d 952, 956 (1977) (quoting *Aviation Ins. Co. v. Barclay*, 237 Md. 318, 206 A.2d 119, 121 (1965)). Because such policies are subject to rules of construction generally applicable to insurance contracts, limiting conditions or exceptions to coverage which are expressed in clear and unambiguous language should be given effect according to the ordinary sense of the terms used. *See Heyd v. Chicago Title Ins. Co.*, 218 Neb. 296, 354 N.W.2d 154, 156 (1984); *Jack Spicer Real Estate*, 373 A.2d at 956; 9 John Alan Appleman & Jean Appleman, *Insurance Law and Practice* § 5201 (Rev. ed. 1981); 13A George J. Couch, *Couch on Insurance* §§ 48:112, 48:132 (2d rev. ed. 1982). In short, whether KayFirst's loss is covered by its title policy depends not on whether the step footing is a trespass, but on whether this particular invasion falls within the terms and limita-

had asserted affirmative defenses against KayFirst based on the law of easements and the principles of adverse possession. *See* Pl.'s Opp'n to Chicago Title's Mot. for Summ.J., Exh. B. Nevertheless, the Court finds itself in general agreement with comments of counsel for Chicago Title, made at the hearing on September 16, 1992, that the issue of its duty to defend KayFirst is not before the Court at this time. KayFirst's only claim against Chicago Title in this litigation appears in Count III of the Second Amended Complaint as a claim for breach of contract based upon an alleged failure to pro-

vide coverage for the losses and damages suffered by KayFirst as a result of the encroachment. No claim appears anywhere in the complaint based upon a breach of contract for an asserted failure to defend. As the governing Federal Rule of Civil Procedure makes clear, a motion for summary judgment is directed to a "claim, counterclaim, or cross-claim or to … a declaratory judgment." Fed.R.Civ.P. 56(a), (b). There is no claim in this lawsuit against Chicago Title for breach of a duty to defend and, consequently, no such claim upon which summary judgment may be granted or denied.

tions of the policy negotiated by the parties.

■ The Court is satisfied that the step footing constitutes an encumbrance upon KayFirst's title to Parcel 4 within the coverage of its title insurance policy. That policy, by its own terms, insures "against loss or damage, not exceeding the amount of insurance stated in Schedule A" caused by

1. Title to the estate or interest described in Schedule A being vested otherwise than as stated therein;

2. *Any* defect in or lien or *encumbrance on such title;*

3. Lack of a right of access to and from the land; or

4. *Unmarketability of such title.*

Pl.'s Ex. A [hereinafter, "the Policy"] (emphasis added). This coverage is limited by exclusions not at issue here and by the exceptions set forth in Schedule B. *See id.* Schedule B provides in pertinent part:

This policy does not insure against loss or damage by reason of the following exceptions:

**General Exceptions:**

(1) Rights or claims of parties in possession not shown by the public records.

(2) *Encroachments,* overlaps, boundary line disputes, and any other matters *which would be disclosed by an accurate survey and inspection of the premises.*

(3) Easements or claims of easements not shown by the public records.

(4) Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

(5) Taxes or special assessments which are not shown as existing liens by the public records.

*Id.* (emphasis added).

The step footing, extending from the retaining wall on the WMATA property some 7 feet into the KayFirst property, is clearly an encroachment.[8] Because it was buried some four feet beneath the surface of the property and was in no way visible on the site, its existence would not be disclosed by an accurate survey and inspection of Parcel 4.[9] That the encroachment was unrecorded is irrelevant, since, unlike the other General Exceptions, General Exception 2 of the Policy contains no express limitation in regard to encroachments not shown by the public records. No other exception or exclusion applies to the step footing.[10] Because the Policy specifically covers loss from *"[a]ny"* encumbrance on or unmarketability of KayFirst's title, subject only to the exceptions and exclusions as expressly set forth, the encroachment falls within the coverage of the Policy if it is an encumbrance on title or renders title unmarketable.

While an encumbrance has been defined as "every right to, or interest in the land granted, to the diminution of the value of the land, but consistent with the passing of the fee of it by the conveyance," *Miller v. Schwinn, Inc.,* 113 F.2d 748, 751 (D.C.Cir. 1940); *Sterling v. Blackwelder,* 302 F.Supp. 1125, 1129 (E.D.Va.1968), this definition is by no means all-inclusive. It has long been established that an encroachment may encumber title or render title unmarketable, particularly if the encroachment is substantial or interferes with the free development of the subject parcel. *See Mid–State Homes, Inc. v. Brown,* 47

---

**8.** To "encroach" may be defined in ordinary terms as "to enter by gradual steps or by stealth into the possessions or rights of another." *Webster's Third New International Dictionary* 747 (1976). The same source defines "encroachment" as "an instance of encroaching (as in the building of a structure in a public park or a fence that projects over a neighbor's land)." *Id.; see also L'Enfant Plaza,* 359 A.2d at 6 (describing as an "encroachment" steel-reinforced concrete extending 1½ to 3½ feet into the subject property at a depth of *twenty-three feet below the* surface of the ground).

**9.** Indeed, as has been noted, *supra,* the claims originally brought against the surveyor have been dismissed by agreement.

**10.** In denying WMATA's Motion for Summary Judgment, the Court has determined that the footing is neither an easement nor a claim of easement that would bring it within General Exception 3.

Ala.App. 468, 256 So.2d 894, 897–99 (1972) (encroachment in the form of a fence rendered title unmarketable); *Pasternack v. Alter*, 123 A. 885, 885–86 (N.J.Ch.1924) (encroachment of two inches of building on adjoining property rendered title unmarketable and "might well involve a suit in ejectment"); *Glyn v. Title Guar. & Trust Co.*, 132 A.D. 859, 117 N.Y.S. 424, 427–28 (1909) (encroachment of a stoop, pilaster, and door cap some nine inches onto plaintiff's property held to be an encumbrance within the coverage of plaintiff's title insurance policy); *Kaplan v. Bergmann*, 122 A.D. 876, 107 N.Y.S. 423, 424 (1907) (encroachment of up to five inches by a building on the adjoining property held to render title unmarketable); *Ziebarth v. Manion*, 161 Wash. 201, 296 P. 561, 563 (1931) (encroachment of a foundation footing of a concrete garage over 7 inches onto appellant's property held to burden title and render it unmarketable); 9 Appleman & Appleman, *supra*, § 5201 (summarizing the principle); 3 Thomas E. Atkinson, *et al.*, *American Law of Property* § 11.49, at 140 (A. James Casner ed. 1952); Roger A. Cunningham, *et al.*, *The Law of Property* § 10.12, at 694 (1984) ("Encroachments of significant dimensions are regarded as making title unmarketable, whether they involve an improvement on the subject property which encroaches on a neighboring parcel, or vice versa. This result follows whether or not the statute of limitations or prescriptive period has run on the trespass."); Annotation, *Marketable Title*, 57 A.L.R. 1253, 1444–45 (1928) (summarizing the older case law).

Even though the cases cited above are not recent, the Court has no reason to think that District of Columbia or Maryland law is inconsistent with the principles expressed therein. On the contrary, the Maryland Court of Appeals recently held, in a case involving an unrecorded, concealed pipeline encroachment across the back yards of some condominiums, that an amended complaint for breach of contract against the vendor for failure to convey good title to the condominiums stated a cause of action. *See Sonnenberg v. Security Management*, 325 Md. 117, 599 A.2d 820, 827 (1992). And while the most factually analogous cases from the District of Columbia involved easements, the Court discerns nothing in them to suggest that District of Columbia courts are hostile to the treatment of substantial encroachments such as the one at issue here as encumbrances upon title. *See Miller v. Schwinn*, 113 F.2d 748; *Doonis v. Mutual Title Co.*, 196 A.2d 480 (D.C.1964).

The undisputed facts make plain that the step footing is a substantial encroachment on Parcel 4 not merely because of its size but because it significantly interferes with KayFirst's commercial development of the site as well. *See Glyn*, 117 N.Y.S. at 428; 3 Atkinson, *et al.*, *supra*, § 11.49, at 140. Even though WMATA has no present right to maintain the footing on the KayFirst property, therefore, the encroachment is of such a nature as to constitute a defect in or encumbrance on KayFirst's title to Parcel 4. At the very least, the footing renders KayFirst's title unmarketable, both because of the encroachment's substantial nature and because it has forced KayFirst— and would force a subsequent buyer—to purchase a lawsuit to protect its interest in Parcel 4. As the Maryland Court of Appeals has explained,

> A marketable title is a title which is free from encumbrances and any reasonable doubt as to its validity, and such as a reasonably intelligent person, who is well informed as to the facts and their legal bearings, and ready and willing to perform his contract, would be willing to accept in the exercise of ordinary business prudence. Accordingly a marketable title must be so far free from defects as to enable the purchaser not only to hold the land in peace but also, if he wishes to sell it, to be reasonably sure that no flaw will appear to disturb its market value.

*Sinclair v. Weber*, 204 Md. 324, 104 A.2d 561, 565 (1954). As that court more recently reiterated, the "need for ... litigation to hold or obtain good title is an essential element in determining marketability." *Myerberg, Sawyer & Rue, P.A. v. Agee*, 51 Md.App. 711, 446 A.2d 69, 71 (1982) (citing and discussing *Berlin v. Caplan*, 211 Md. 333, 127 A.2d 512 (1956)).

It follows from the foregoing discussion that the encroaching step footing constitutes a defect in or an encumbrance on KayFirst's title to Parcel 4 and, moreover, renders its title to that property unmarketable. Because the encroachment does not fall within the applicable General Exception to KayFirst's title policy, KayFirst's loss as a consequence of the encroachment is covered and Chicago Title is liable as a matter of law. Chicago Title's Motion for Summary Judgment as to Count III of Kay-First's Second Amended Complaint must, therefore, be denied.

Accordingly, for the reasons stated above it is

ORDERED, that KayFirst's Motion for Partial Summary Judgment is GRANTED; and, it is

FURTHER ORDERED, that WMATA's Motion for Summary Judgment is DENIED; and, it is

FURTHER ORDERED, that Chicago Title's Motion for Summary Judgment is GRANTED IN PART, with respect to the status of the footing as a trespass, and DENIED IN PART, with respect to Chicago Title's liability for KayFirst's loss; and, it is

FURTHER ORDERED, that all parties in this litigation shall appear before the Court for a status conference on March 26, 1993, at 9:30 a.m.